IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

**FILED**
AUG 2 1 2007
WILLIAM B. GUTHRIE
Clerk, U.S. District Court
By:_____
Deputy Clerk

| | |
|---|---|
| **DONYEIL J. McINTOSH,** | ) |
| Petitioner, | ) |
| v. | ) Case No. CIV 04-229-RAW-KEW |
| **JUSTIN JONES,**[1] | ) |
| Respondent. | ) |

## REPORT AND RECOMMENDATION

NOW before the Magistrate Judge is petitioner's petition for a writ of habeas corpus. Petitioner, an inmate currently incarcerated at Davis Correctional Facility in Holdenville, Oklahoma, attacks his conviction in Muskogee County District Court Case Number CF-2001-793 for First Degree Murder (Count I) and Possession of a Stolen Vehicle (Count 2). He sets forth the following grounds for relief:

I. The State's alleged expert evidence tainted the jurors' minds, in violation of Oklahoma statutory law and the United States Constitution.

II. Disruptive conduct by the victim's family created a hostile environment that interfered with petitioner's right to a fair trial.

III. The evidence was insufficient to support a finding of First Degree Murder.

IV. The trial court erred when it failed to instruct on First Degree Manslaughter, when the jury was given a voluntary intoxication instruction.

---

[1] Petitioner is incarcerated in a private facility, so the proper respondent is Justin Jones, Director of the Oklahoma Department of Corrections. *See* Rule 2(a) of the Rules Governing Section 2254 Cases; Braden v. 30th Judicial Circuit Court of Ky., 410 U.S. 484, 494-95 (1973).

V.  The trial court's failure to provide the jury with accurate information in answering their question about the meaning of the possible sentences.

VI.  Ineffective assistance of trial counsel.

VII. The accumulation of errors deprived petitioner of due process of law.

The respondent concedes that petitioner has exhausted his state court remedies for the purpose of federal habeas corpus review and has submitted the following records to the court for consideration in this matter:

A.  Petitioner's brief in his direct appeal.

B.  The State's brief in petitioner's direct appeal.

C.  Opinion affirming petitioner's Judgments and Sentences. *McIntosh v. State*, No. F-2002-348 (Okla. Crim. App. June 19, 2003).

D.  Transcript of petitioner's jury trial.

E.  Original Record in Muskogee County District Court Case No. CF-2001-793.

## Facts

The Oklahoma Court of Criminal Appeals (OCCA) set forth the facts of the case as follows:

> McIntosh spent most of August 7, 2001, with his cousin Frederick Derrick. That afternoon they smoked crack cocaine and "wet sticks"-- cigarettes dipped in PCP and embalming fluid. At approximately 5:00 p.m., Derrick shot at some people trying to collect a debt from McIntosh, then gave McIntosh the gun. Later that evening the two went to Alonzo Bush's house looking for drugs. Bush drove them to and from a convenience store. Derrick was in the front passenger seat of Bush's car, and McIntosh was in the back. As Bush drove, McIntosh put the gun to Bush's temple and fired. Derrick stopped the car, then moved Bush to the passenger seat and drove to Coody

Creek, a secluded area in south Muskogee. McIntosh and Derrick pulled Bush from the car. McIntosh went through Bush's pockets, taking money and jewelry, then the two dropped Bush in the creek. Bush's body was found the next morning.

McIntosh and Derrick went to Derrick's grandmother's house. There they picked up Catina Thomas, Derrick's cousin. The three drove to Oklahoma City and stopped at a carwash, where McIntosh and Derrick tried to clean the car. Thomas saw her parole officer and got permission to leave the state, and the three drove Bush's car to California. They were stopped and arrested in Oakland on August 10.

McIntosh told Derrick he shot Bush because he was a "rida," meaning tough, and that he wanted respect. He told Thomas he shot Bush because Bush, who owed him money, thought he could put something over on him since McIntosh used drugs. He told Muskogee police that he shot Bush during a struggle when the gun accidentally went off. Derrick testified that Bush was driving along when McIntosh suddenly shot him. He neither saw nor heard any struggle between the two. Bush was killed by a contact gunshot wound to the head.

*McIntosh v. State*, No. F-2002-348, slip op. at 1-2 (Okla. Crim. App. June 19, 2003). The state court's factual findings are presumed correct unless the applicant produces clear and convincing evidence to rebut the presumption. 28 U.S.C. § 2254(e)(1).

## Ground I: Improper Expert Testimony

Petitioner alleges improper expert testimony "tainted the jurors' minds" and denied him a fair trial. In opening and closing arguments, petitioner admitted he was responsible for Alonzo Bush's death, but he maintained the shooting resulted from a struggle between the two men during which the gun was bumped and was either accidentally or unintentionally discharged (Tr. 1 45-46, Tr. III 46). The State presented Dr. Andrew Sibley, a forensic pathologist, to disprove petitioner's claim (Tr. II. 18). As he did on direct appeal, petitioner objects to Dr. Sibley's testimony that allegedly was based on personal opinion, claiming it

3

was beyond the scope of his expertise, and was more prejudicial than probative.

Dr. Sibley testified he found soot adjacent to and inside the victim's head wound (Tr. II 26). He opined that the only way to get the residue inside the wound would have been to have had the gun next to the victim's temple (Tr. II 27). When Dr. Sibley was asked whether the gunshot wound to the victim's head showed any indication of an accidental shooting, he replied:

> Well, when you think about what has to occur--first of all, there aren't a whole lot of accidental shootings, at least from my perspective. In my judgment, a lot of things have to occur for an accidental shooting to occur. The gun has to be loaded, the gun has to be pointed at something, the finger has to be placed on the trigger, sometimes the hammer has to be locked back in order for the gun to fire, or it has to be cocked, and then the finger has to actually pull the trigger. Those are a lot of things that have to occur, you know, in a certain sequence, just at the right time. Whenever we're talking about contact, you have another thing that has to occur, and that is that the gun has to be placed so that the muzzle is touching the head. Now, the likelihood of all those things happening accidentally, I think, is--is very low. I've never seen a contact gunshot wound which was accidental. Some people might say a Russian roulette where--where people, you know, take their chances and put a gun against their head, that those are accidental. But those aren't, they're an intentional act that they do. The only true accidental gun deaths that I consider, are ones where it's a malfunction of the gun or the gun drops and goes off, things like that. But for all that sequence to occur and the gun to be placed with the muzzle against the skin, I've never seen that as an accident.

(Tr. II 28-29).

On direct appeal the OCCA noted that petitioner did not object at trial to this part of Dr. Sibley's testimony. *McIntosh*, slip op. at 3. The portion of the testimony concerning the mechanics of firing a gun and his opinion about what would constitute an accidental shooting "does not contain specialized knowledge to assist the trier of fact, and was not proper expert opinion testimony." *Id.* (footnote omitted). The OCCA found, however, that petitioner "fails

4

to show that its admission probably resulted in a miscarriage of justice, or substantially violates his constitutional or statutory rights." *Id.*

> Dr. Sibley's discourse on the mechanics of firing a gun neither answered the question nor was within the realm of his expertise as a medical examiner. However, Dr. Sibley's description of the steps that must be taken before a gun is fired surely was not news to jurors, who could use common sense to reach the same conclusions. Put another way, Dr. Sibley's opinions regarding accidental gunshots did not rise to the level of expert assistance to jurors, because they are opinions that could be held and understood by laypersons without any expert explanation.

*McIntosh*, slip op. at 3-4 (footnotes omitted).

The respondent alleges this claim involves an issue of state law, which is not cognizable in a federal habeas corpus action. "As a general matter, federal habeas corpus relief does not lie to review state law questions about the admissibility of evidence and federal courts may not interfere with state evidentiary rulings unless the rulings in question rendered the trial so fundamentally unfair as to constitute a denial of federal constitutional rights." *Moore v. Marr*, 254 F.3d 1235, 1246 (10th Cir.) (quotations and citations omitted), *cert. denied*, 534 U.S. 1068 (2001). Here, the court finds Dr. Sibley's testimony did not deny petitioner a fair trial, so habeas relief is not warranted.

**Ground II: Conduct by the Victim's Family**

Petitioner claims in Ground II that the victim's family wore t-shirts with the victim's image within two feet of the jury. He contends this incident influenced the outcome of his trial. On direct appeal the OCCA denied relief on this claim as follows:

> At some point before testimony began, at least two of Bush's family members wore pictures of Bush pinned to their shirts (not, as McIntosh's brief suggests . . . "t-shirts depicting the victim") while they sat near the jury. The record does not reflect precisely when this occurred, but the trial court's

5

comments suggest the pictures were pinned on after the jury was sworn. McIntosh appears to admit this in his brief. During the recess after the jury was sworn, McIntosh made a record objecting to the pictures. The State responded that family members had been admonished and agreed to take the pictures off. The parties discussed how to handle the situation, and the trial court asked the jury whether "anything [had] come to your observation during the recess that might affect your ability to perform your duties . . . ." No juror answered affirmatively. The trial court asked the observers to be seated away from the jury, and admonished them not to try and influence the jurors in any way on penalty of contempt of court.

> McIntosh appears to claim that jurors were improperly prejudiced against him because family members wore Bush's photo after the completion of voir dire, but before opening instructions--a period of time which included a recess while jurors were not in the courtroom. His suggestion that this "disruptive conduct . . . created a hostile and intimidating environment" for jurors is pure speculation. McIntosh claims this possibility of prejudice could not be cured since the jury panel had already been sworn. He relies on cases in which victims' families engaged in persistent disruptive conduct during voir dire. Under those circumstances, this Court agreed that the families' behavior might very well have improperly influenced the jury, but found no prejudice because trial counsel could determine whether potential jurors had been affected as voir dire progressed. Here, the record does not reflect that jurors actually saw the photographs. No juror responded when the trial court asked whether they had seen anything in the courtroom which might affect their duties as jurors. The record does not support McIntosh's suggestion that the family's actions caused jurors to base their verdict on emotion rather than the evidence. This proposition is denied.

*McIntosh*, slip op. at 4-5 (internal citations omitted).

The respondent alleges this court cannot entertain this state law claim concerning the alleged misconduct by the victim's family. "[F]ederal habeas corpus relief does not lie for errors of state law." *Matthews v. Price*, 83 F.3d 328, 331 (10th Cir. 1996) (citations omitted). Furthermore, the court has reviewed the portion of the transcript concerning this issue (Tr. I 130-33) and finds there is no evidence that any jurors saw the photos or was prejudiced by them.

6

## Ground III: Insufficient Evidence

Petitioner next claims the evidence was insufficient to support his conviction for First Degree Murder. The OCCA found no merit in this claim on direct appeal:

> He admits he shot Bush point-blank in the head, causing his death, but argues the State did not prove that he intended to kill Bush when he shot. The jury was properly instructed that malice may be formed in an instant, and may be inferred from the circumstances surrounding the crime. McIntosh claims these factors show he acted without malice: (1) when he got the gun from Derrick that afternoon, it was cocked and ready to fire; (2) Derrick knew of no problems between Bush and McIntosh or of any plan to shoot Bush; (3) McIntosh shot Bush while he was driving at 20 to 30 miles per hour. These factors might indicate an impulsive decision to commit murder, but do not suggest a lack of malice.
>
> McIntosh primarily relies, as he did at trial, on the claim that he was too intoxicated on drugs to form the specific intent to commit the crime. Voluntary intoxication may be considered on the question of intent, and a defendant must establish such intoxication that his mental powers were overcome and he was unable to form criminal intent. The evidence showed McIntosh smoked crack cocaine and PCP-laced cigarettes several hours before the murder. Derrick testified that he thought McIntosh felt the effects of the drugs at the time of the crime, and that McIntosh seemed to be "in a zone" after the murder. In telephone conversations from the jail several weeks after the crime, McIntosh told his girlfriend he was on drugs at the time of the shooting. However, McIntosh did not make this claim to police when he was arrested and confessed. Derrick and Thomas thought McIntosh was on drugs but not intoxicated that night. He was able to play basketball and converse before and after the crime. He said variously that he killed Bush because he was tough, he wanted respect, and Bush was trying to cheat him. Bush was killed by single contact wound to the head, and no evidence supported McIntosh's claim of a struggle. The trial court generously gave McIntosh's requested instruction on voluntary intoxication. The jury weighed the evidence and found McIntosh acted with malice aforethought. Any rational trier of fact could have found beyond a reasonable doubt that McIntosh intended to kill Bush.

*McIntosh*, slip op. at 5-7 (footnotes omitted).

The respondent asserts that under the applicable federal habeas corpus statutes, habeas corpus relief on this issue is proper only when the state court adjudication of a claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"Sufficiency of the evidence can be considered to be a mixed question of law and fact." *Case v. Mondagon*, 887 F. 2d 1388, 1392 (10th Cir. 1989), *cert. denied*, 494 U.S. 1035 (1990). In federal habeas review of a state court conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

The Supreme Court has repeatedly emphasized the deference the reviewing court owes to the trier of fact and "the sharply limited nature of constitutional sufficiency review." *Wright v. West*, 505 U.S. 277, 296 (1992) (citing *Jackson*, 443 U.S. at 319). "[A] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume--even if it does not affirmatively appear in the record--that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at 326. The court must "accept the jury's resolution of the evidence as long as it is within the bounds of reason." *Grubbs v. Hannigan*, 982 F.2d 1483, 1487 (10th Cir. 1993) (citing *United States v. Edmondson*, 962 F.2d 1535, 1548 (10th Cir. 1992)). "To

be sufficient, the evidence supporting the conviction must be substantial; that is, it must do more than raise a mere suspicion of guilt." *Beachum v. Tansy*, 903 F.2d 1321, 1332 (10th Cir.), *cert. denied*, 498 U.S. 904 (1990) (citing *United States v. Troutman*, 814 F.2d 1428, 1455 (10th Cir. 1987)).

To determine whether there was sufficient evidence presented at trial to sustain petitioner's conviction, the court first must look to Oklahoma law for the elements required for the crime. *Jackson*, 443 U.S. at 324 n.16; *see also Torres v. Mullin*, 317 F.3d 1145, 1152 (10th Cir.), *cert. denied*, 540 U.S. 1035 (2003).

> A person commits murder in the first degree when that person unlawfully and with malice aforethought causes the death of another human being. Malice is that deliberate intention unlawfully to take away the life of a human being, which is manifested by external circumstances capable of proof.

Okla. Stat. tit. 21, § 701.7(A).

Petitioner admitted shooting Bush in the back of the head (Tr. II 210-11). Derrick testified there was no confrontation between petitioner and Bush (Tr. II 73-74). Petitioner told Derrick he shot Bush because he was a "rida," meaning he was "big and bad, tough," and he wanted respect (Tr. II 59-60, 72-74). He told Thomas he shot Bush because Bush owed him money (Tr. II 210-11). In one version of the shooting, petitioner told the investigating police officer that Bush was "punking" him, meaning putting him down or picking on him (Tr. II 159). Any of these reasons showed petitioner acted with malice aforethought, and the shooting was intentional, beyond a reasonable doubt. His subsequent acts, including dumping the body, and his possession of the victim's money, jewelry, and car (Tr. II 65-70, 81-82, 84-85, 170-71, 209) also point to an intentional act. Thomas testified petitioner acted as though he thought shooting Bush was funny, so she told him, "'That's not

9

funny. Don't take a person's life because a person owe you money. That's not right'" (Tr. II 212).

With respect to petitioner's claim that he was too intoxicated to form the specific intent, Derrick testified he and petitioner had used the same drugs earlier in the day, and they went to a park and shot free throws earlier that evening before the shooting (Tr. II 47-48). Derrick said both he and petitioner were conversing coherently that evening (Tr. II 48-49). Furthermore, petitioner never told the police that intoxication impaired him in any manner (Tr. II 156, 166).

After careful review of the record, the court finds the evidence was sufficient under the standards of *Jackson v. Virginia* to convict petitioner of First Degree Murder. The OCCA's determination of this issue, therefore, was not contrary to, or an unreasonable application of federal law, and this court finds the OCCA did not base its decision on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d). This ground for habeas corpus relief fails.

## Ground IV: Jury Instructions

Petitioner alleges the trial court erroneously failed to instruct the jury on First Degree Manslaughter when the jury was instructed on voluntary intoxication. The OCCA denied relief on this claim as follows:

> ... McIntosh claims he was prejudiced when the trial court instructed on second degree murder, which requires some degree of intent, but not first degree manslaughter, which requires none. He argues this deprived him of the benefit of the voluntary intoxication instruction, as jurors had no lesser included offense before them which did not have an intent element. McIntosh claims the bulk of case law shows that the jury must be instructed on both voluntary intoxication and first degree manslaughter. On the contrary, cases before and after *Shrum* [*v. State*, 991P.2d (Okla. Crim. App. 1999)], clearly

10

state that the jury should be instructed on all forms of homicide supported by the evidence. If evidence supports a finding of first degree manslaughter due to voluntary intoxication, that instruction should be given. No evidence supported that instruction here, and the trial court did not err in failing to *sua sponte* instruct the jury on first degree manslaughter.

*McIntosh*, slip op. at 8-9 (footnote omitted).

The respondent alleges the state court's rejection of this claim regarding entitlement to an instruction on the lesser included offense of First Degree Manslaughter was not contrary to, or an unreasonable application of, clearly established federal law.

> In a habeas corpus proceeding attacking a state court judgment based on an erroneous jury instruction, a petitioner has a great burden. *Lujan v. Tansy*, 2 F. 3d 1031, 1035 (10th Cir. 1993), *cert. denied*, 510 U.S. 1120 (1994). A state conviction may only be set aside in a habeas proceeding on the basis of erroneous jury instructions when the errors had the effect of rendering the trial so fundamentally unfair as to cause a denial of a fair trial. *Shafer v. Stratton*, 906 F.2d 506, 508 (10th Cir. 1990), *cert. denied*, 498 U.S. 961 (1990). . . . "An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977). The degree of prejudice from the instruction error must be evaluated in the context of the events at the trial. *United States v. Frady*, 456 U.S. 152, 169 (1982).

*Maes v. Thomas*, 46 F. 3d 979, 984 (10th Cir.), *cert. denied*, 514 U.S. 1115 (1995). "Unless the constitution mandates a jury instruction be given, a habeas petitioner must show that, in the context of the entire trial, the error in the instruction was so fundamentally unfair as to deny the petitioner due process." *Tiger v. Workman*, 445 F.3d 1265, 1267 (10th Cir. 2006) (citations omitted). The OCCA expressly found there was no evidence to support an instruction on First Degree Manslaughter. *McIntosh*, slip op. at 9. This determination by the state appellate court is entitled to a presumption of correctness under 28 U.S.C. § 2254(d). *Lujan v. Tansy*, 2 F.3d 1031, 1037 n.3 (10th Cir. 1993), *cert. denied*, 510 U.S. 1120 (1994).

"[A] petitioner in a non-capital case is not entitled to habeas relief for the failure to give a lesser-included offense instruction 'even if in our view there was sufficient evidence to warrant the giving of an instruction on a lesser included offense.'" *Id.* at 1036 (quoting *Chavez v. Kerby*, 848 F.2d 1101, 1103 (10th Cir. 1988)). Therefore, this ground for habeas relief fails.

### Ground V: Jury's Question about Sentencing

The possible sentences for petitioner's First Degree Murder conviction were imprisonment for life without parole, or imprisonment for life (O.R. 20). During deliberations, the jury sent out the following written question about the meaning of the sentences: "What would be the max and or min time served on a life sent. w/ parole w/ murder I?" *McIntosh*, slip op. at 9. The trial court replied, "I couldn't begin to tell you." *Id.* There was no objection to the court's answer. *Id.* At the end of deliberations, the jury imposed the maximum sentence--life without the possibility of parole (O.R. 89).

Petitioner asserts the trial court erroneously failed to provide the jury with accurate information about the meaning of the possible sentences. The OCCA found the court's response was an accurate statement, because "actual time served is not determined by the district court." *McIntosh*, slip op. at 9. The appellate court continued:

> The Legislature has provided that persons convicted of first degree murder shall serve not less than 85% of the sentence of imprisonment imposed. The trial court could have instructed jurors that McIntosh would be required to serve at least 85% of a life sentence. However, this would not have answered the jury's question, as 85% of "life" does not translate into a term of years. McIntosh suggests the trial court should have continued by instructing the jury on the Oklahoma Pardon and Parole Board policy treating life sentences as sentences of 45 years. This would be inappropriate: parole "is a discretionary procedure exercised by the executive branch which provides for a condition subsequent to the conviction and sentence after the party has been

12

> incarcerated in the state penitentiary. . . . Such a response may well confuse or mislead jurors, rather than fulfilling the trial court's duty of care to clear away juror confusion.
>
> McIntosh suggests that the jurors' speculation over the answer to their question resulted in an excessive sentence. The trial court could not have answered the jury's question with the specificity McIntosh demands. McIntosh makes no claim that his sentence was generally excessive; under the facts and circumstances of the case it was not.

*McIntosh*, slip op. at 9-10 (footnotes omitted).

The respondent alleges this claim is another issue of state law that is not appropriate for a federal habeas corpus action. The court notes that in *Anderson v. State*, 130 P.3d 273, 282 (Okla. Crim. App. 2006), the OCCA reconsidered the issue of instructing jurors on parole eligibility and held that jurors should be instructed on the statutory limitations on parole eligibility under Okla. Stat. tit. 21 § 12.1. and 13.1. The OCCA specified, however, that the holding would have only prospective application. *Id.* at 283. Therefore, the *Anderson* decision has no application in the analysis of petitioner's claim in Ground V.

Issues concerning sentencing are a matter of state law. *See Shafer v. Stratton*, 906 F.2d 506, 510 (10th Cir.), *cert. denied*, 498 U.S. 961 (1990). Petitioner has presented no authority for his claim that the trial court's failure to provide the jury with a more detailed answer to their question was a violation of his constitutional rights. This ground for habeas corpus relief is meritless.

## Ground VI: Ineffective Assistance of Counsel

Petitioner complains his trial counsel was only a "warm body who failed in every aspect of *Strickland v. Washington*." Counsel allegedly "failed to object at the critical stages of trial [and] failed to object to the fundamental principals [sic] of a jury trial by testing the

13

adversary process." Petitioner further asserts "[c]ounsel failed to request situational jury instructions, . . . to plan a defense, . . . to investigate the case at hand, present evidence, [or] call expert testimony favorable to the petitioner['s] defense of intoxication."

On direct appeal petitioner claimed three areas of ineffective trial counsel: (1) failure to object to Dr. Sibley's opinion testimony, (2) failure to request a jury instruction on first degree manslaughter, and (3) failure to thoroughly investigate and present evidence favorable to him. *McIntosh*, slip op. at 11. The OCCA found that "although parts of Dr. Sibley's testimony were inappropriate as expert opinion," they merely stated common-sense lay perceptions and could not have contributed to an improper verdict." *Id.* With respect to the jury instructions, the OCCA found the evidence would not have supported a first degree manslaughter instruction. In addition, petitioner complained that counsel failed "to request instructions on 'all lesser included offenses supported by the evidence,'" but he did not suggest what those lesser included offenses might have been. *Id.*

Petitioner requested an evidentiary hearing from the OCCA to develop the facts to support his claim. *Id.* In his motion for the hearing, he stated "counsel (a) should have cross-examined Dr. Sibley on his lack of qualifications to give an opinion on firearms and, if necessary, called an expert to refute the opinion; and (b) presented evidence that a product warning was issued for the model of gun McIntosh used to shoot Bush." *Id.* Because Dr. Sibley's improper expert testimony did not affect the verdict, "[e]vidence of the product warning for the type of gun used in the crime would not have contradicted the evidence suggesting the gun did not discharge accidentally; even McIntosh did not claim the gun was dropped or substantially jarred." *Id.* at 11-12. The OCCA found petitioner did not show by clear and convincing evidence the strong possibility that counsel was ineffective, so his

14

motion for an evidentiary hearing was denied. *Id.* at 12.

"There is a strong presumption that counsel provided effective assistance of counsel and petitioner has the burden of proof to overcome that presumption." *United States v. Rantz*, 862 F.2d 808, 810 (10th Cir. 1988), *cert. denied*, 489 U.S. 1089 (1989) (citing *United States v. Cronic*, 466 U.S. 648, 658 (1984)). In *Strickland* the United States Supreme Court set forth the two-part test for determining the validity of a habeas petitioner's claim of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland*, 466 U.S. at 687.

Without expressing an opinion on whether appellate counsel's performance was deficient, the court finds it is "easier to dispose of an ineffectiveness claim for lack of prejudice than to determine whether the alleged errors were legally deficient." *Davis v. Executive Director of Dep't of Corrections*, 100 F.3d 750, 760 (10th Cir. 1996), *cert. denied*, 520 U.S. 1215 (1997) (quoting *United States v. Haddock*, 12 F.3d 950, 955 (10th Cir. 1993)). "To establish prejudice under *Strickland*, [petitioner] must show there exists 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* (quoting *Strickland*, 466 U.S. at 694). After careful review, this court finds petitioner has not shown prejudice, the determination of this claim by the OCCA was consistent with federal law, *see* 28 U.S.C. § 2254(d), and this claim is meritless.

### Ground VI: Cumulative Error

Finally, petitioner claims the accumulation of errors in his trial deprived him of due process of law. The OCCA found the error with respect to Dr. Sibley's testimony did not require relief, and there were no other errors. *McIntosh*, slip op. at 12. Therefore, his claim of cumulative error was denied. *Id.*

"'Cumulative-error analysis applies where there are two or more actual errors. It does not apply, however, to the cumulative effect of non-errors.'" *Castro v. Ward*, 138 F.3d 810, 832-33 (10th Cir.) (quoting *Hoxsie v. Kerby*, 108 F.3d 1239, 1245 (10th Cir.), *cert. denied*, 525 U.S. 971 (1998)). Here, the OCCA found one error concerning Dr. Sibley's testimony, but cumulative error requires at least two actual errors. This ground for habeas relief also fails.

**ACCORDINGLY,** the Magistrate Judge recommends that this action be, in all respects, dismissed.

Pursuant to 28 U.S.C. § 636(b)(1)(C), the parties are given ten (10) days from being served with a copy of this Report and Recommendation to file with the Clerk of the Court any objections with supporting briefs. Failure to file timely written objections to the Magistrate Judge's recommendations may result in waiver of appellate review of factual and legal questions. *Talley v. Hesse*, 91 F.3d 1411, 1412-13 (10th Cir. 1996); *Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991).

DATED this 21st day of August 2007.

*/s/ Kimberly E. West*
**KIMBERLY E. WEST**
**UNITED STATES MAGISTRATE JUDGE**